STURGIS, Chief Judge
(dissenting).
As I understand the evidence, the jury could have concluded, inter alia, that the defendant driver of the fourth automobile in line, Mrs. Harrell, upon becoming alerted to the fact that the third car in line had stopped or was coming to a stop, suddenly turned her car to the right and drove it off onto the shoulder of the road where it came to rest on the right or slightly in front of and generally paralleling the third car in line, which had come to a stop in its lane of traffic on the surfaced part of the highway, and that plaintiff’s automobile, the fifth in line, upon being confronted with a situation of emergency, developed by the precipitate action of the driver of the fourth car, was not negligent in first making a move to the left with intent to pass around to the left of the line of the three stopped vehicles and, upon finding the lane of traffic on the left blocked by oncoming east *637 bound traffic, in pulling back to the right where his vehicle collided with the third car in line. Had the case been submitted to the jury, it might have found that the injury suffered by the plaintiff was proximately caused by defendants’ negligence.
I suggest that it is irrelevant that plaintiff’s husband, who testified as a witness in her behalf, is a lawyer. I also suggest it is equally irrelevant that defendants’ automobile did not become involved in the collision when its driver executed the maneuver of suddenly driving it off of the highway and onto the shoulder of the road. The material question of fact was whether that maneuver in itself, under all the facts and circumstances, was negligently executed and thereby proximately contributed to plaintiff’s injury. Indeed, in my opinion this is the crux of the case. I am persuaded that the evidence is in sharp conflict on that material issue of fact and, consequently, that it should be submitted to the jury for determination in accordance with its exclusive power to resolve questions of fact. I also suggest that the evidence reveals disputed questions of material fact with respect to whether the driver of defendants’ car gave the required signal of intention to turn out of the lane of traffic, and there is conflict as to the distances between and speéd of the respective cars, which in turn bears upon the degree of care required under all the circumstances. To better illustrate my position, other factual details follow.
The driver of the third car in line, a Mr. Wells, testified that his car was traveling at about 50 miles per hour when he saw the brake lights of the second car in line go on; that he then applied his brakes and upon glancing in his rearview mirror saw the defendants’ car swerve slightly in the line of traffic, but did not see it turn off the road or observe any signal flashing on that car to indicate a right-hand turn. Without sliding or skidding, Mr. Wells brought his car to a stop a few feet behind the second car in line and was almost immediately struck from the rear by the car in which plaintiff was riding.
The driver of the car in which plaintiff was riding testified, in substance, that for the last quarter of a mile as he approached the scene of the accident he was following four or five car lengths behind the defendants’ car, which was proceeding normally in the rain along a straight and level highway ; that just before he reached the point of collision he saw the defendants’ car “dodge or turn to the right shoulder of the road at about a forty-five degree angle— sharp”; that no arm or light signal was given to him and no lights came on defendants’ car until it was in the maneuver of leaving the road; that when defendants’ car uncovered the lane of traffic in which he was traveling at a speed of between 45 and 50 miles per hour, he saw the third car in line with which he collided; that said car was stopped on the road and his first reaction was to move his car toward the center of the road and proceed in the left lane, but found a car was coming toward him in that lane too fast to permit him to cross to the left shoulder in front of it; and that he then undertook to move back toward his lane in an effort to drive his car into a ditch on the right. He testified that he had the brakes on “about half in going to the center of the road to try to pass,” but when he found out he had to stop to avoid hitting the third car in line that was stopped, he put his brakes on as hard as he could; that while he intended to try to get over to the right side and go down in the ditch, he didn’t have enough room to do so before colliding with said third car in line.
Defendant Adrian Harrell, who is the husband of defendant Betty Harrell and owner of the fourth car in line that was driven by her, was riding as a passenger on her right. He was called by plaintiff as an adverse witness and testified, in substance, that he and his wife were talking as they approached the point of collision at a speed of around 45 miles per hour; that she let up on the accelerator and this caused him to *638 look ahead; that he then saw several cars stopped or coming to a stop on the road, whereupon, because of the weather conditions, he told his wife to pull off on the side of the road; and that after applying her brakes “three or four times” she did so. Upon being asked, he denied that he told his wife to “Watch it,” or that he called her attention to the stopped cars, or that when he looked up as aforesaid there was a car stopped on the highway 30 feet in front of him, or that his wife, the driver of his car, at that time had done nothing about it.
Defendant Harrell was then inquired of concerning a visit made to his home by a representative of the appellant, accompanied by a stenographer, and a conversation that purportedly took place at that time. The following colloquy took place between counsel for plaintiff and the witness with respect to these transactions:
“Q. And when I asked you about how the collision occurred do you recall me asking you this question: ‘Would you state in your own words just what happened as near as you can recall?’ and you answered ‘My wife and I were talking and it was drizzling rain.’ And I asked ‘Did you have your windshield wipers on?’ and you said ‘Right. The road was wet. I looked up and I said “Watch it, honey, cars up ahead” ’ ?
“A. I don’t recall making that statement.
“Q. Do you admit or deny making that statement?
'“A. I don’t recall.
“Q. Could you have made it?
“A. I don’t recall making it.
***** *
“Q. You don’t recall making that statement ?
“A. No, sir.
Is that statement true? The road was wet. I looked up and said “Watch it, honey, cars are stopping up ahead” ’ ? ¡O
The road was wet, but I don’t recall saying Watch it.’
Then I asked you about how far ahead of you were they and you answered T guess at least thirty feet. We didn’t see no lights or anything on them; they were already stopped. I said to watch it. There were four cars on the road, and I said how about pulling off to the side of the road, and she just pulled off to the side of the road.’ Did you make that statement? o
Some of it I did. I don’t recall making some of it. >
What don’t you recall? a
Saying Watch it.’ <
You recall that the car stopped up ahead was thirty feet up in front of you? a
No, I don’t recall saying that. <
How far do you say now the car was up ahead? a
About five car lengths. c
Mr. Harrell, before your wife commenced to pull off the road were you aware that there was a black Chevrolet following your Oldsmobile in the same direction? a
No, there was not a car behind us.
There was not? a
No, sir. <
When your wife pulled off on the side of the road on the shoulder, how long was she stopped before the collision occurred? a
A good half minute I suppose. I really don’t know.
*639 “Q. Could it have been as much as a split second?
“A. It was longer than that.
“Q. Could it have been less than ten seconds?
“A. No, it was more than ten.
“Q. Less than twenty seconds?
“A. No, more.
“Q. Between twenty and thirty seconds that your car was stopped before the impact occurred?
“A. Yes, sir.
“Q. On that same occasion when I was talking to you about this collision down at your home in Tampa, just four days after the collision, was your recollection of what happened then more accurate than what it is now after the passage of time?
“A. I believe so.
“Q. Your memory of what happened was better in June of 1962 than it is on October 1, 1963? Is that correct ?
“A. I recall the accident, and my memory is pretty good.
“Q. On that occasion that I was talking about down at your home when I asked you about how the collision occurred, and I asked you did you see a Chevrolet behind you or any car following you, did you answer ‘No. But I wasn’t driving and I don’t know whether my wife seen it or not’ ?
“A. Yes, sir.
******
“Q. On that same occasion do you recall me asking you this and you answered: ‘How far were you from the last or closest of those stopped cars when you first noticed?’ and you said ‘About thirty feet I believe.' Like I said my wife was driving and I guess she seen it, and when I looked back I told her to watch it; there was a car stopped, and I said to pull off the side of the road and she did.’ And I asked you further: ‘About how close were you to-them when you first saw this stopped car ?’ And you said ‘Me’ and! I said ‘Yes’ and you answered ‘About thirty feet.’ Do you recall' making that statement?
“A. Not the last part, I don’t recall' making it.
“Q. Is your answer that you don’t recall or didn’t say the car was-thirty feet?
“A. I don’t recall.
“Q. You may have made it?
“A. I don’t recall.
“Q. In that same conversation were these questions and answers given: Q. You told your wife to slow down? A. Yes, sir. Q. Had she slowed down before then as far as you were able to tell? A. It seems like she did take her foot off the accelerator but I am not sure now. Q. There was no-sudden decrease of speed? A. No, sir.
Do you recall telling me that?
“A. No, sir.
“Q. Did in fact you make that statement about your wife having-done nothing but decrease her speed by taking her foot off the-accelerator ?
“A. I don’t remember. ******
“Q. Before your wife started to slowdown you say her speed was how-fast?
*640 ,fA. Between forty-five and fifty miles an hour.
“Q. Was she following another car?
“A. Not until we came up on these cars where they had stopped.
“Q. This car was stopped when you first became aware of its presence?
'“MR. O’NEAL: Object, because the statement by counsel is not the testimony previously given by the witness.
“THE COURT: As I recall that was his testimony; I will overrule the objection.
“Q. Your answer to the question is yes?
“A. What was the question?
“Q, This car was stopped before you first saw it?
“A. Right.
“Q. You distinctly saw the car’s brake lights or tail lights burning when you first saw it?
“A. Yes, sir.
“Q. On this same occasion when I was asking you about the collision, do you recall a question, Mr. Harrell, ‘Did any of the cars have their headlights on?' and your answer T am not sure but I don’t believe so, because if they did have them on I think I would have seen their tail lights.’ ‘You didn’t see their tail lights?’ Your answer: ‘Yes, that is what made me tell my wife to pull off the road, because their tail lights weren’t on.’
“A. They were on.
“Q. Your statement now is that their tail lights were on?
“A. They were on.
“Q. Do you remember making that statement ?
“A. I don’t recall.”
Plaintiff also called Mrs. Harrell as an adverse witness. She testified generally that when brake lights appeared on the third car in line she applied the brakes on her car, activated the right turn indicator, without skidding pulled off to the right shoulder of the road at a speed of about 10 miles per hour, came to a stop with the front end of her car about even with the rear end of the third car in line on the hard-surfaced portion of the highway, and that 20 to 30 seconds after coming to a stop she heard plaintiff’s car as it passed immediately before it crashed into the said third car. She was then inquired of, inter alia, concerning an affidavit prepared by her attorneys and executed by her as purporting to set forth the facts surrounding the accident, and in this context the following questions were addressed and answers given:
“Q. That affidavit said: T was not certain I was going to be able to stop in time to avoid colliding with the car in front of me.’ Is that in essence your testimony now? The reason you pulled off was to avoid colliding with the Wells car?
“A. I don’t see any difference.
“Q. It is one and the same to you?
“A. Yes, sir.
“Q. As you were going in a Westerly direction toward Cross City on that rainy afternoon could you see ahead of you? What was the visibility?
“A. I could see there was a group of cars ahead of me, but I don’t know how far. I know the traffic was heavy.
‘■‘Q. Had you been following those cars for some time ?
“A. I believe so; I am not sure.
*641 “Q. Do you recall how far you were behind the Wells car?
“A. It was about four or five car lengths.
******
“Q. Did your husband say anything when the Wells car commenced stopping?
“A. He thought I should pull off the road cause there was so many cars already on the road and it was wet.
“Q. Did he call your attention to the Wells car by saying Watch it, Honey’ ?
“A. No, sir.
******
“Q. How long were you in a stopped position, if any time, before the Jackson car came along and struck the Wells car?
“A. About twenty or thirty seconds, I guess.
“Q. Did you do anything to indicate you were coming off the road?
“A. I turned on the blinkers.
“Q. Did you know the Jackson car was behind you?
“A. I wasn’t aware of the JaHkson car behind me.
“Q. Why did you give a turn signal?
“A. A habit.”
The plaintiff produced as a witness Mrs. Norma Sams, a free-lance reporter who had occasion to go to the home of the defendants with counsel for plaintiff on the occasion testified to by defendant Adrian Harrell. The testimony elicited from this witness was designed to impeach certain testimony given by defendant Adrian Harrell when called as an adverse witness for the plaintiff. According to Mrs. Sams, she took stenographic notes of questions asked of Mr. Harrell on the occasion of that visit and of the answers given by him. Reading from those notes, the witness testified that the following questions and answers, inter alia, were given to and answered by Mr. Harrell:
“Q. Did you see the Chevrolet [plaintiff’s car] behind you or any car following you?
“A. No, that is what surprised me, which I was not driving. I don’t know whether my wife seen it or not.
******
“Q. How far were you from the last or closest of these stopped cars, when you first noticed that they were stopped? About thirty feet I believe you said?
“A. Like I said, my wife was driving and I was talking, and I guess she seen it, but when I looked hack I told her to watch it, there was a car stopped. I said, ‘Pull up to the side of the road,’ so she did.
“Q. About how close were you to it when you first saw this stopped car, the closest of these stopped cars?
“A. Me?
“Q. Yes.
“A. About thirty feet.
“Q. After that, you told your wife to pull off to the right?
“A. Yes.
“Q. Had she slowed down before that as far as you were able to tell ?
“A. Seems like she did take her foot off the accelerator, but I’m not sure now.
“Q. There wasn’t any sudden decrease of speed ?
“A. No.
******
*642 “Q. Mr. Harrell, did any of the cars have their headlights on?
“A. I did. I am not sure, but I don’t believe so, because if they would have had them on, we would have seen them.
“Q. Their tail lights ?
“A. Yes, because that is what made me tell my wife to pull off the road, because the tail lights were not on.”
It is obvious from the above quoted testimony before the jury that there was substantial conflict in the testimony relating to material issues on the trial:
A motion for directed verdict should not be granted unless the jury cannot under any view of the evidence lawfully find for the plaintiff. Burkett v. Belk-Lindsey Company, 137 So.2d 266 (Fla.App.1962); Budgen v. Brady, 103 So.2d 672 (Fla.App.1958). Oil such motion the plaintiff is entitled to every favorable inference and conclusion arising from the evidence. Chilton v. Dockstader, 126 So.2d 281 (Fla.App.1961). Ordinarily issues of negligence and contributory negligence should be submitted to the jury. Beikirch v. City of Jacksonville Beach, 159 So.2d 898 (Fla.App.1964).
Section 317.371(3), Florida Statutes, F.S.A., provides that where opportunity permits, no person shall stop or suddenly decrease the speed of a vehicle on the public highway without first giving an appropriate signal in the manner provided by law to the driver of any vehicle immediately to the rear. By reasonable implication, the statute requires that one driving a motor vehicle on the public highways is charged with the duty of maintaining such an outlook of the traffic ahead of him as to be in position, should occasion arise, to give an appropriate signal in ample time to give the driver of a motor vehicle closely following him an opportunity to escape the hazard of a sudden emergency. The duty cast by the statute on the leading vehicle should be weighed in the light of common experience and knowledge of traffic patterns upon our congested highways. When this is done, the logic of the statute and rule of negligence flowing therefrom is clear and convincing.
The case law is pregnant with vain attempts to define the line of demarcation between the power of the trial court to grant a pretrial summary judgment and the power, upon being confronted with identical facts at the trial, to grant a motion for a directed verdict. It is well established, however, that neither should be granted if the proofs or reasonable inferences derivable therefrom produce a controverted question of material fact. It is the duty of the driver of an automobile to have it under such control as to be able under ordinary circumstances to avoid colliding with a motor vehicle lawfully operating upon the public highway in front of him, and a prima facie presumption of negligence is cast on the driver of a car which strikes the injured party or his vehicle from the rear. The latter rule, however, was promulgated as an aid to evidence in an action between the immediate parties to such a collison and is not in any sense a rule of liability. Indeed, it has no application whatever to the issues in this cause. As said in Gertler v. Peterson, 116 So.2d 778, 779 (Fla.App.1960):
"It is subject to proof that it [the presumption] does not apply in a particular situation. A sudden emergency which is not ordinarily foreseeable may be such a situation and the existence or nonexistence of the emergency situation is a question of fact for the fury. Therefore the summary judgment may not be supported by the proposition that the plaintiff, Gertler, was guilty of contributory negligence as a matter of law.” (Emphasis supplied)
The only lawful excuse for the precipitate action of the driver of defendants’ car herein is that a situation of emergency developed and its character was such as to relieve defendants of the consequences. In my opinion the question of whether such situation came to exist without fault of the defend *643 ants or was attended by contributory negligence of the plaintiff was for the jury to determine, along with the other controverted questions of fact. The record before this court reveals substantial conflict with respect to issues of material fact on which the answer to that question necessarily depended, e. g.,: There is a definite conflict between the testimony and reasonable inferences to be drawn therefrom concerning (1) the speed of defendants’ car and its maneuvers immediately prior to the collision, (2) whether the defendant driver gave an appropriate signal for the benefit of the driver of the car in which plaintiff was riding, indicating her intent to maneuver her car as she did, and (3) generally, whether under all the facts and circumstances the driver of defendants’ automobile created a situation of emergency from which the driver of plaintiff’s automobile could not escape.
It is axiomatic that each operator of a motor vehicle on the public highways owes a duty of reasonable care to others similarly occupied. Those who operate motor vehicles on congested highways should not be permitted to compel their fellow travelers to play Russian roulette or musical chairs; and where there is any material issue of fact on the question of negligence, it should be left to the jury to resolve.
For the reasons stated, I would reverse the judgment appealed and remand the cause for a new trial.
I therefore dissent.